UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X

UNITED STATES OF AMERICA

    - against -

                  **MEMORANDUM AND ORDER**
                      13-CR-586 (RRM)

MICHAEL O'BRIEN, et al.,

              Defendant.
---------------------------------------------------------X

ROSLYNN R. MAUSKOPF, United States District Judge.

      Following a jury trial, defendant Michael O'Brien, proceeding *pro se*, was found guilty of

conspiracy to import methylone and anabolic steroids, importation of methylone and anabolic

steroids, conspiracy to possess with intent to distribute methylone and anabolic steroids,

possession with intent to distribute methylone and anabolic steroids, and maintaining drug-

involved premises. At the close of the government's case-in-chief, O'Brien moved for a

judgment of acquittal under Federal Rule of Criminal Procedure ("Rule") 29(a). The Court

reserved decision pursuant to Rule 29(b). In his post-trial motion, O'Brien renewed his motion

under Rule 29 and moved for a new trial pursuant to Rule 33.[1] The government opposed the

motion. For the reasons that follow, the Court denies O'Brien's motions in their entirety.

## BACKGROUND

### I. Pre-Trial Proceedings

      On October 10, 2013, O'Brien was arrested at his apartment, 40-22 College Point

Boulevard Apt. 3PHR, Queens, New York (the "College Point apartment") pursuant to an arrest

---

[1] O'Brien's post-trial motion originally was brought pursuant to Rules 29 and 33 on September 8, 2015. (Original Mot. (Doc. No. 158).) O'Brien subsequently amended his motion on September 9, 2015. (Post-Trial Mot. (Doc. No. 159).) After the government opposed the post-trial motion, (Govt.'s Opp'n (Doc. No. 160)), O'Brien amended his motion again to withdraw his Rule 33 arguments and bring the motion solely under Rule 29. (Am. Post-Trial Mot. (Doc. No. 161) at 8.) The government filed an additional brief in opposition. (Govt.'s Opp'n Am. Post-Trial Mot. (Doc. No. 162).) Out of an abundance of caution, and given O'Brien's *pro se* status, the Court addresses O'Brien's arguments under both Rule 29 and Rule 33.

warrant for jumping bail after pleading guilty in state court to criminal possession of a firearm. O'Brien waived his *Miranda* rights, made statements to the police, and consented to a search of the College Point apartment and a second apartment, 132-35 41st Road, Apt. 5E, Queens, New York (the "41st Road apartment").

At the 41st Road apartment, agents found, among other things, twelve kilograms of methylone and twenty-one kilograms of a variety of anabolic steroids. O'Brien was subsequently indicted and charged in a five-count indictment with conspiracy to import methylone and anabolic steroids, importation of methylone and anabolic steroids, conspiracy to possess with intent to distribute methylone and anabolic steroids, possession with intent to distribute methylone and anabolic steroids, and maintaining drug-involved premises.

On April 29, 2014, O'Brien moved to suppress all post-arrest statements made to law enforcement officers and all physical evidence obtained on October 10, 2013. (Mot. Suppress (Doc. No. 41); Mem. Supp. Mot. Suppress (Doc. No. 46).) O'Brien argued that he did not voluntarily waive his *Miranda* rights or provide consent to search his apartment because he was suffering from Gamma-Hydroxybutrate ("GHB") withdrawal. (*See* Mem. Supp. at 1–2.)[2]

On August 13 and August 22, 2014, the Court held a suppression hearing where O'Brien and special agents from the Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), and the Drug Enforcement Administration ("DEA") testified. On March 20, 2015, the Court denied O'Brien's suppression motion.

---

[2] All citations to Court documents utilize the Electronic Case Filing System ("ECF") pagination.

## II.    The Evidence at Trial

A jury trial commenced on July 20, 2015.  The government's evidence at trial included the testimony of thirteen witnesses.  O'Brien then presented his defense case, calling three witnesses.  The evidence established, relevant to the instant motion, the following:[3]

### A.    Package Seizures and the Arrest of Kimberly Ruud

On September 20, 2013, Customs and Border Protection ("CBP") officers seized three packages at the John F. Kennedy International Airport ("JFK") mail branch facility.  (Transcript of Trial Proceedings ("Tr.") at 33, 38, 45.)  The first package was addressed to Kimberly Ruud at 1204 Avenue U in Brooklyn, New York, and it contained approximately one kilogram of methylone.  (Tr. at 33–35; Govt.'s Ex. ("GX") 1, 1A, 39.)  The second package was addressed to Charlene Ruud at 41 Schermerhorn Street in Brooklyn, New York, and it contained approximately one kilogram of methylone.  (Tr. at 38–40, 447; GX 3, 3A, 39.)  The third package was addressed to Kim Chow at 512A 77th Street in Brooklyn, New York, and it contained approximately one kilogram of methylone.  (Tr. at 48–49, 447–48; GX 2, 2A, 39.)  Each of these addresses was for a different mailbox store.  (GX 1A, 2A, 3A.)  After seizing the three packages, CBP notified HSI agents, who then took possession of the packages.  (Tr. at 45–46.)

On September 23, 2013, HSI agents went to the three mailbox store locations listed on the seized packages in anticipation of conducting a controlled delivery.  (Tr. at 46–47.)  Special Agent Deron James testified that, on September 23, 2013, he was the team leader at the Shipping

---

[3] This summary is limited to evidence adduced at trial that is necessary to discuss issues raised in the defendant's Rule 29 and Rule 33 motions.  Furthermore, in summarizing the evidence at trial, the Court is mindful that "[i]n reviewing a challenge to the sufficiency of the evidence underlying a guilty verdict [pursuant to Rule 29, the court] 'must review the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor.'" *United States v. Cain*, 671 F.3d 271, 302 (2d Cir. 2012) (quoting *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004)).

Store located at 512A 77th Street in Brooklyn. (Tr. at 47–49.) After he arrived at the Shipping Store, Agent James was informed that there was another package at the store, which was addressed to Kimberly Ruud at the same mailbox number as the package containing methylone. (Tr. at 51.) That day, Ruud arrived at the Shipping Store, picked up both packages, and began to drive away. (Tr. at 54–55.) Ruud subsequently was arrested, and she provided consent for the agents to search her car. (Tr. at 55–57.) Upon searching the car, agents found the two packages that Ruud had just picked up in the front passenger's seat, as well as four more packages in the trunk. (Tr. at 57–58.) The packages seized from Ruud's car contained a total of 2,988.6 grams of methylone and 2,985.6 grams of various types of anabolic steroids. (Tr. at 447–50; GX 39.) All six packages were sent from China. (GX 2A, 5A, 6A, 7A, 8A, 9A.) That same day, Special Agent Sean Gabay of HSI recovered another package addressed to Kimberly Ruud from a different mailbox store in Brooklyn, which contained another 1,004 grams of anabolic steroids. (Tr. at 372–74, 448–49; GX 4, 4A, 39.)

Special Agent Joshua Schottenfeld of HSI testified that he conducted a search of one of Ruud's cellphones, (GX 400), and discovered a series of communications on September 23, 2013 with defendant Michael O'Brien, who was listed in the phone as "Big." (Tr. at 204–10; GX 401C.)[4] In the text messages, O'Brien provided Ruud with instructions identifying the mailboxes from which she should pick up packages, as well as which mailbox to avoid. (Tr. at 208–11; GX 401C.) Specifically, at 3:15 A.M., Ruud received a message from O'Brien, which read, "138, 131, 2025, 106, 180." As Agent Schottenfeld testified, those numbers were listed in a ledger found in O'Brien's College Point apartment and correspond to mailbox numbers where packages containing drugs were sent. (Tr. at 208.) Ruud responded, "K." (Tr. at 211; GX

---

[4] As discussed more fully below, text messages recovered from a cellphone found in O'Brien's apartment link O'Brien to these messages.

401C.)  At 11:10 A.M., Ruud received a message from O'Brien, which said, "Don't go to 131 today."  (Tr. at 208–09; GX 401C.)  Ruud responded, "Thanks, too late.  LOL."  (Tr. at 211; GX 401C.)  O'Brien then wrote, "Okay, that's fine.  As long as no problems."  (Tr. at 209; GX 401C.)  Ruud responded, "No, no worries."  (Tr. at 211; GX 401C.)  O'Brien then wrote, "180 was there?" followed by another message, which said, "How many did you get done so far?"  (Tr. at 209; GX 401C.)  Moreover, a search of one of O'Brien's cellphones, (GX 211), revealed that on the day of Ruud's arrest, at approximately 3:20 P.M., O'Brien texted "Ant" saying, "Need to talk, big problems."  (Tr. at 182; GX 405F.)  Agent Schottenfeld later testified that "Ant" was Anthony Deservio, an individual who worked for O'Brien and was also referred to as the "bald guy."  (*See* Tr. at 200–02.)  Ant responded, "You want me to meet you home," and O'Brien responded, "yes please, sorry to have you hanging around, just big problems."  (Tr. at 182; GX 405F.)

### B.  The October 10, 2013 Arrest

Special Agent Edward Alahverdian of the DEA testified that on October 10, 2013, he, along with agents from HSI, members of the U.S. Marshals Fugitive Task Force, and officers from the Suffolk County Police Department ("SCPD"), went to the College Point apartment to arrest O'Brien on an outstanding Suffolk County bench warrant.  (Tr. at 97–98.)  Agent Alahverdian testified that while O'Brien was being arrested by local authorities on their warrant, agents from DEA and HSI accompanied them as they had information that O'Brien was involved in narcotics trafficking.  (*Id.*)  Between six and twelve agents and officers then entered the building through the side entrance and took the freight elevator to O'Brien's floor.  (Tr. at 101–02.)  Agent Alahverdian testified that, at approximately 11:00 a.m., the agents and officers entered the apartment, conducted a protective sweep, and placed O'Brien under arrest.  (Tr. at 102–05, 142.)

After O'Brien was arrested, Agent Alahverdian testified that he identified himself to O'Brien, and that O'Brien expressed interest in speaking with him, stating that he "could help [Agent Alahverdian] out." (Tr. at 105–06.) Agent Alahverdian and Special Agent Vincent Marino proceeded to read O'Brien his *Miranda* rights. (Tr. at 107–08.) Agent Alahverdian testified that O'Brien stated that he understood his rights and still wished to speak to the agents. (Tr. at 109–10.) Agent Alahverdian further testified that O'Brien gave the officers oral permission to search the College Point apartment. (Tr. at 110.)

Agent Alahverdian testified that while the other agents and officers conducted the search, O'Brien told him and Agent Marino that he was addicted to GHB and requested to take a dose. (Tr. at 111–12, 679.) The agents refused O'Brien's request, and O'Brien then requested that he be allowed to take a Valium in order to delay the onset of any withdrawal symptoms. (Tr. at 112–13, 665–66.) Agent Marino gave O'Brien a Valium pill, believing that O'Brien had a prescription for the pills. (Tr. at 112–13, 665–66, 679.)

O'Brien was then taken into Agent Marino's vehicle in order to transport him to the First Precinct in Babylon, Suffolk County. (Tr. at 113–14.) Agent Marino drove the vehicle, Agent Alahverdian rode in the passenger seat, and O'Brien and a SCPD officer were in the back of the car. (Tr. at 115.) Agent Alahverdian testified that, during the car ride, O'Brien was talkative, offering information about how he ran his drug business. (Tr. at 116.) Specifically, Agent Alahverdian testified that O'Brien informed him that he ordered methylone from China over the internet, using his black Acer computer. (Tr. at 116–18.) O'Brien stated that two of the websites he used to order drugs were Alibaba and Silk Road. (Tr. at 118.) Agent Alahverdian further testified that O'Brien stated that he had the drugs shipped to various mailboxes and UPS stores and would monitor the tracking information to determine when the packages of drugs had arrived. (Tr. at 117.) Agent Alahverdian testified that O'Brien stated that he would send people,

including an individual named Michael Wagner, to pick up the packages and would pay these individuals approximately $200 for each package that they picked up. (Tr. at 117.) Agent Alahverdian testified that according to O'Brien, he would purchase the methylone for $1,900 per kilogram and sell it for $30,000 per kilogram. (Tr. at 126.)

After they arrived at the precinct, the agents allowed O'Brien to smoke a cigarette outside before proceeding to the squad room. Agents Alahverdian and Marino discussed O'Brien's stash house, the 41st Road apartment. (Tr. at 119–20.) Agent Alahverdian testified that he had information that this location was used as a stash house by O'Brien for narcotics trafficking. (Tr. at 119–20.) After being asked about the stash house, O'Brien stated that he would give the agents consent to search the location. (Tr. at 119–20.) The agents asked O'Brien about the specific address of the location, to which he "shook his head and said yes" to confirm that it was his stash house. (Tr. at 120.) Agent Alahverdian further testified that O'Brien informed the agents that they would find approximately ten kilograms of methylone at that location, as well as unopened packages of chemicals, steroids, and various paraphernalia he used in his business operations. (Tr. at 120–21.) Agent Marino then provided O'Brien with a consent-to-search form, (GX 121), in which O'Brien provided written consent in front of Agents Alahverdian and Marino to search the College Point apartment, the 41st Road apartment, and his computers and phones. (Tr. at 121, 125; GX 121.) Agent Alahverdian testified that he then told O'Brien that he wanted to continue working with him on this investigation, but would need to turn him over to the Suffolk County officers to process his arrest on the local warrant. (Tr. at 125.) Following the interview of O'Brien, officers from SCPD transported O'Brien to Suffolk County Superior Court, where he was arraigned on the bench warrant. (Tr. at 660.)

### C. The October 29, 2013 Arrest

Special Agent James Flynn of HSI testified that after O'Brien was released from custody from Suffolk County, Agent Flynn and other HSI agents were put on surveillance duty in the Bronx, New York to try to locate O'Brien and arrest him on the underlying federal charges. (Tr. at 618–19.) On October 29, 2013, HSI agents located and arrested O'Brien outside an apartment in the Bronx. (Tr. at 618–21.) At the time, O'Brien had on him and in his vehicle approximately $4,852, two watches valued at more than $60,000, six cell phones, and a vial labeled "Genzyme." (Tr. at 621–29; GX 500-A, 501–02.) In the presence of Agent Marino, Agent Alahverdian advised O'Brien of his *Miranda* rights, which he waived. (Tr. at 132–36; GX 122.) O'Brien then provided written consent for the agents to search two of his vehicles and two suitcases. (Tr. at 136–39; GX 123.)

### D. The October 10, 2013 Searches

Agents conducted searches of the College Point apartment and the 41st Road apartment pursuant to the signed consent-to-search forms. (Tr. at 157, 162.)

#### a. The College Point Apartment

According to Agent Schottenfeld, agents found in the apartment 18 cell phones, 12 laptops, currency counting machines, a printer used to create IDs, a ledger, vials of liquid steroids labeled "Genzyme," 250 sheets of "Genzyme" labels, fraudulent identification materials, and approximately $10,356 in cash. (Tr. at 164–66.) He further testified that many of the "Genzyme" vials were labeled with the names of other steroids, such as Testosterone. (Tr. at 168, 189.)

Agent Schottenfeld testified that he conducted a search of two of the eighteen cell phones that were found at the College Point apartment. (Tr. at 170; GX 210, 211.) A search of the cell phone found in O'Brien's bedroom showed that O'Brien's contacts included, among others,

Mike Wagner, Chao J.J., JJ realtor, Landlady Lina, and Danielle Girace.[5]  (Tr. at 174–75; GX 210, 404D.)  A search of the cell phone found in O'Brien's living room showed text messages sent by O'Brien, in which he identified himself as Jeremy Soto, the "big guy," and "big."  (Tr. at 179–80; GX 211, 405F.)  Text messages sent the day of Ruud's arrest stated that O'Brien had "big problems."  (Tr. at 182; GX 405F.)  Several other text messages sent by O'Brien stated that the situation was getting worse and that he was "shut down."  (Tr. at 183–84.)  Specifically, on September 25, 2013, O'Brien sent a message, which stated, "bald guy got picked up," and Agent Schottenfeld testified that the phrase "picked up" commonly refers to someone being arrested.  (Tr. at 183; GX 405F.)  On September 28, 2013, O'Brien sent another text message, which stated, "The situation that was erupting while you were visiting got worse."  (Tr. at 184; GX 405F.)  O'Brien received a response, "Damn, complete shut down?" to which he responded, "for the most part" and "250 in losses."  (Tr. at 184–85; GX 405F.)  On October 2, 2013, O'Brien received a text message, which stated, "Brother, any news?" and O'Brien responded, "Yes, I'm shut down."  (Tr. at 185; GX 405F.)

Agent Schottenfeld also testified about the ledger and an envelope recovered from the apartment.  (Tr. at 199–200, 212–20.)  The ledger contained lists of anabolic steroids, lists of locations where Kimberly Ruud picked up drugs, and the phone number of the phone Ruud carried at the time of her arrest.  (Tr. at 199–202; GX 201.)  In the envelope were applications and receipts for multiple mailboxes in Brooklyn that matched the locations from which, according to the ledger, Ruud had picked up packages of methylone and steroids.  (Tr. at 212–19; GX 202A–E.)  The agents also found twenty-seven airway bills for packages mailed from

---

[5] These contacts were later used to connect O'Brien to the 41st Road apartment.  (*See* Tr. at 633–36.)

China, addressed to various individuals and companies, including to "Mike Wagner" and other individuals with the last name "Wagner." (Tr. at 220–25; GX 209A.)

Among the twelve laptops seized, one matched the description of the black Acer computer described by O'Brien earlier that day. (GX 228; Tr. at 281.) Special Agent David Bauer of HSI conducted a forensic analysis of the computer. (Tr. at 280–81.) Agent Bauer testified that he recovered text files from the computer that contained discussions of orders for various types of steroids, wire transfer instructions, mailbox addresses, tracking instructions, lists of drugs, and lists of his arrested workers. (Tr. at 282–97; GX 407–09, 411–14, 416–21.) The web browser history showed searches for "seller methylone" and searches for the USPS tracking information for the packages seized from Ruud's car. (Tr. at 311–12, 322–25; GX 428, 434–35.) Additionally, the computer contained emails related to the Alibaba website, which O'Brien had informed Agent Alahverdian he used to purchase methylone from China. (Tr. at 319–20; GX 429.)

Along with the ID printer, agents found blank identification cards and numerous false identification documents. (Tr. at 191–93; GX 207A–B.) Specifically, agents recovered (1) a social security card, a Connecticut Department of Motor Vehicles form, a birth certificate, and a police identification card with O'Brien's photo in the names "Jeremy Paul Soto" and "Jeremy Soto"; (2) a social security card and a birth certificate in the names "Steve Andre Manolas" and "Steve A. Monolas"; (3) a birth certificate in the name "George Manolas"; (4) a social security card and a birth certificate in the name "David Lee Walker"; and (5) a police identification card with O'Brien's photo in the name "Stephen Conte." (Tr. at 193–95; GX203A–B, 204A–D, 205A–C, 206A–B.)

### b. The 41st Road Apartment

Special Agents John Moloney and Sean Gabay of HSI testified about their search of the 41st Road apartment pursuant to O'Brien's signed consent-to-search form. (Tr. at 334–415.) According to Agent Moloney, the landlord initially denied the agents entry into the apartment. (Tr. at 337–38.) In order to gain entry, agents faxed a copy of the consent-to-search form to the landlord. (Tr. at 338.) Once inside, agents found numerous liquid and powdered substances, drug packaging materials, drug paraphernalia, pills, and a large pill press machine. (Tr. at 339.) Agent Moloney testified that the large pill press machine, which is used to turn powder substances into pills, weighed approximately 500 or 600 pounds. (Tr. at 344–45; GX 301K.) Agents recovered a number of pills, which tested positive for anabolic steroids, (Tr. at 459; GX37), as well as a large box filled with hundreds of empty pill bottles, (Tr. at 347–48, 387–88; GX 301W–X, 305.) Agents also found vials with "Genzyme" labels, identical to the vials at the College Point apartment. (Tr. at 342, 379; GX 301G–H.) In the kitchen cabinets, agents found small scales and beakers of yellow liquid. (Tr. at 341–42, 377, GX 301B–H, 304A–C.) In the bedroom, agents found a heater that could be used for processing drugs. (Tr. at 389; GX 306A–B.) In the closet, agents found eight packages of methylone. (Tr. at 352–58; GX 301P.)

During the search, agents also recovered packages and discarded packing materials, which were sent from China and addressed to various individuals, including "Jeremy Soto" and individuals with the last name "Wagner." (Tr. at 359–60, 380, 391–405; GX 17A, 19A, 309A–D, 301KK, 311G, 313G, 314A–B.) Agent Gabay testified that agents found Ritz Carleton Reward cards in the name of Jeremy Soto and two photographs of O'Brien. (Tr. at 401–03, 415; GX 313A–D.) In one of the photographs, O'Brien is with Danielle Girace, his former girlfriend who operates a tanning salon. (Tr. at 401–03, 415; GX 313B; *see* GX 627, 629.)

The government called senior forensic chemist Christopher Benintendo of the DEA to testify about the substances found at the apartment. (Tr. at 436.) Benintendo testified that a number of the pills recovered from the 41st Road apartment tested positive for anabolic steroids. (Tr. at 458.) According to Benintendo, agents recovered approximately 12,134 grams of methylone and 21,927 grams of anabolic steroids from the apartment. (Tr. at 451–58; GX 39.) According to methylone expert Special Agent Michael Fernandez of HSI and anabolic steroid expert Dr. Harrison Pope, a total of approximately seventeen kilograms of methylone and twenty-one kilograms of anabolic steroids were found in the apartments and on Kimberly Ruud at her arrest. (Tr. at 472–73, 581.) Agent Fernandez testified that seventeen kilograms of methylone was equivalent to approximately 170,000 doses, valued at $1.7 million dollars if sold on the streets of New York. (Tr. at 473.) Dr. Pope testified that twenty-one kilograms of anabolic steroids was equivalent to 21,000 doses, valued at $2.1 million if sold on the streets of New York. (Tr. at 579, 582.)

### E. Chao Jones's Trial Testimony

The real estate broker for the College Point and 41st Road apartments, Chao Jones, testified that she showed the College Point apartment to a man named "George" and his girlfriend Danielle in 2012. (Tr. at 634–35.) Jones testified that Danielle worked in a beauty business, which George had helped her open. (Tr. at 635–36.) George agreed to rent the apartment and paid the first year's rent up front in cash. (Tr. at 635.) According to Jones, approximately a year and a half later, George contacted her again to help him find a location for an office in the same neighborhood. (Tr. at 636.) She stated that George told her that he ran an import-export business, dealing with goods primarily from China. (Tr. at 636–37.) Jones testified that George leased the 41st Road apartment from her as his office, and she witnessed the

execution of the lease agreement. (Tr. at 633; GX 300.) Jones signed the agreement as "J.J. Jones" and provided the College Point apartment as George Manolas's current address. (Tr. at 633; GX 300.)

On cross examination, O'Brien asked Jones if she could "identify George in the courtroom today?" (Tr. at 640.) Jones was unable to identify the person she knew as George in the courtroom, responding, "Can't remember now." (Tr. at 640.) The trial transcript of the exchange reads:

> Q: Do you see – can you identify in the courtroom today the person who leased the apartment or either property from you?
> A: George?
> Q: Yes. Can you identify George in the courtroom today?
> A: Can't remember now.

(Tr. at 640.)

### F. The Defense Case

O'Brien called three witnesses – SCPD Detective Jason Lucia, Special Agent Vincent Marino, and Special Agent Joshua Schottenfeld. Defense witness Detective Lucia testified that he was present for O'Brien's October 10, 2013 arrest and was responsible for taking O'Brien into custody on the bench warrant after he was apprehended by the federal agents. (Tr. at 655–57.) According to Detective Lucia, O'Brien was quiet, calm, and cooperative after his arrest. (Tr. at 657.) Detective Lucia recalled that O'Brien was a large, muscular man, and did not remember observing any issues with respect to O'Brien's medical conditions. (Tr. at 659–61.) Detective Lucia was also present during O'Brien's arraignment and testified that O'Brien was calm throughout the arraignment and did not appear to suffer from his GHB addiction. (Tr. at 660–61.)

O'Brien then called Agent Marino, who was involved in O'Brien's arrest on October 10, 2013. (Tr. at 662–63.) Agent Marino testified that after O'Brien's arrest, O'Brien told the

agents that he was addicted to GHB and requested a dose of GHB and then a dose of Valium in order to prevent the onset of withdrawal symptoms. (Tr. at 679.) Agent Marino allowed O'Brien to take a Valium pill that was lying next to a prescription bottle in O'Brien's apartment. (Tr. at 666–67.) Agent Marino and Agent Alahverdian then interviewed O'Brien at the Suffolk County precinct. (Tr. at 671–72.) According to Agent Marino, throughout the time he spent with O'Brien in the car and at the precinct, O'Brien exhibited no withdrawal symptoms and had no difficulty understanding the agents' questions. (Tr. at 672–73, 684.) It was only at the conclusion of their interview that O'Brien indicated he wasn't feeling well. (Tr. at 684.)

After the arraignment, O'Brien was taken to Peconic Bay Medical Center for medical attention regarding his GHB addiction. (*See* Tr. at 660–61; Def.'s Ex. ("DX") A, B.) Pursuant to a stipulation with the government, O'Brien offered medical records from Peconic Bay Medical Center into evidence. (Tr. at 769–70; DX A, B.) According to the medical records, O'Brien was admitted to Peconic Bay on October 10, 2013 and discharged October 14, 2013. (Tr. at 770.) The records state that O'Brien was treated for symptoms consistent with withdrawal, such as visual hallucinations and delirium tremens. (*See* DX A, B.)

### G. The Trial and Verdict

At trial, O'Brien represented himself, with Ephraim Savitt, Esq., appointed by the Court as standby counsel. The Court granted O'Brien's request to proceed *pro se* on May 5, 2015, at a conference in which the Court conducted an extensive colloquy, pursuant to *Faretta v. California*, 422 U.S. 806 (1975), to ensure that O'Brien's decision was knowing and intelligent. (*See* 5/15/15 Order); *see also United States v. Hurtado*, 47 F.3d 577, 583 (2d Cir. 1995) (finding the district court adequately inquired into the defendant's *pro se* request by warning him of the specific perils of representing himself and the advantages of having legal representation). Throughout the trial, O'Brien was actively engaged in mounting a defense. He asked key

14

questions on cross-examination of the government's witnesses, made proper objections, and raised appropriate legal arguments, conferring with standby counsel when necessary. As discussed more fully below, O'Brien focused much of his defense on the circumstantial nature of the evidence connecting him to the two locations from which the bulk of the evidence was seized, including the fact that the 41st Road apartment was rented in the name "George Manolas," and the inability of the real estate broker, Chao Jones, to identify O'Brien as the lessee.

The jury deliberated for two days. On the first day of deliberations, the jury requested copies of Jones's testimony, among other requests. (Tr. at 894.) The government and O'Brien agreed on the portions of the transcript to be sent to the jury. (Tr. at 894–95.) Neither party made any objections to the request or to the portions of the transcript that were provided to the jury. The following day, the jury returned a verdict finding O'Brien guilty on all five counts. (Tr. at 924–29.)

After the verdict, O'Brien requested to forgo representing himself from this point forward, and to have standby counsel, Ephraim Savitt, represent him. (Tr. at 933.) The Court granted O'Brien's request and appointed Mr. Savitt as counsel. (Tr. at 933–34.) However, on August 11, 2015, O'Brien again requested to proceed *pro se* in order to file his Rule 29 and Rule 33 motions, and for sentencing. (Mot. to Proceed Pro Se (Doc. No 153).) The Court granted O'Brien's request to proceed *pro se* on August 13, 2015, at a conference in which the Court conducted an extensive colloquy, and again warned O'Brien of the perils of representing himself, particularly due to legal complexities of sentencing and other post-trial proceedings. (8/13/16 Tr. at 2–18); *see Faretta*, 422 U.S. at 835–36.[6] O'Brien understood these concerns, and persisted

---

[6] On February 3, 2016, after O'Brien filed his post-trial motions, the Court granted standby counsel's motion to withdraw as attorney and for appointment of new standby counsel. (2/3/16 Min. Entry; Mot. to Withdraw (Doc. No.

in his desire to represent himself.  (8/13/16 Tr. at 2–18.)  As with his efforts during the trial,

O'Brien's extensive post-trial submissions and arguments appropriately raised key issues with

regard to the sufficiency of the evidence, claimed irregularities in the trial proceedings,

challenges to the guideline calculations – including challenges to the drug conversion ratio for

methylone – and various specific offense characteristic enhancements sought by the government.

## STANDARD OF REVIEW

### I.     Rule 29

Rule 29 provides that, on a defendant's motion, the Court "must enter a judgment of

acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R.

Crim. P. 29(a).  Where a defendant first moves for judgment of acquittal at the close of the

government's case and the court reserves decision on the motion, the court "must decide the

motion on the basis of the evidence at the time the ruling was reserved."  *See* Fed. R. Crim. P.

29(b); *see also United States v. Velasquez*, 271 F.3d 364, 371 (2d Cir. 2001).  "A defendant who

challenges the sufficiency of the evidence supporting his conviction 'bears a heavy burden.'"

*Velasquez*, 271 F.3d at 370 (quoting *United States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001)).

"Not only must the evidence be viewed in the light most favorable to the Government and all

permissible inferences drawn in the Government's favor, but the jury verdict must be upheld if

'any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt.'"  *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (internal citation

omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also United States v.

Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) ("[T]he court may enter a judgment of acquittal

only if the evidence that the defendant committed the crime alleged is nonexistent or so meager

---

170).)  The Court appointed Susan G. Kellman, Esq. as the new standby counsel for *pro se* defendant O'Brien.  (*See* 2/3/16 Min. Entry.)

that no reasonable jury could find guilt beyond a reasonable doubt." (internal quotation marks

omitted)). In deciding a Rule 29 motion for judgment of acquittal, the Court must "view pieces

of evidence 'not in isolation but in conjunction.'" *United States v. Torres*, 604 F.3d 58, 67 (2d

Cir. 2010) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 978 (2d Cir. 1990)).

In resolving a Rule 29 motion, a court should "avoid usurping the role of the jury."

*Guadagna*, 183 F.3d at 129. A court must "defer to the jury's assessment of witness credibility

and the jury's resolution of conflicting testimony." *United States v. Bala*, 236 F.3d 87, 93–94

(2d Cir. 2000). This high standard of deference for the jury's verdict is "especially important

when reviewing a conviction of conspiracy . . . because a conspiracy by its very nature is a

secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in

court with the precision of a surgeon's scalpel." *United States v. Lombardozzi*, 491 F.3d 61, 67

(2d Cir. 2007) (internal quotation marks and citations omitted). Moreover, a court cannot

"substitute its own determination of . . . the weight of the evidence and the reasonable inferences

to be drawn for that of the jury." *Guadagna*, 183 F.3d at 129 (internal quotation marks omitted).

Indeed, the jury's verdict will be upheld even when it is based entirely on circumstantial

evidence. *Jackson*, 335 F.3d at 180. Even under the "less stringent standards" to which courts

hold submissions from *pro se* litigants, the government may "prove its case solely through

circumstantial evidence." *See United States v. Stringer*, No. 10-CR-632 (GEL), 2012 WL

11269, at *4 (S.D.N.Y. Jan. 3, 2012), *aff'd,* 730 F.3d 120 (2d Cir. 2013) (citing *Ferran v. Town

of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993); *United States v. Rodriguez*, 392 F.2d 539, 544 (2d Cir.

2008)) (internal quotation marks omitted). "In fact, if the court concludes that either of the two

results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury

decide the matter." *Guadagna*, 183 F.3d at 129 (internal quotation marks omitted).

## II.    Rule 33

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  Generally, the Second Circuit disfavors Rule 33 motions for a new trial.  *United States v. Figueroa*, 421 F. App'x 23, 24 (2d Cir. 2011) (citing *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).  While courts generally have broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, "courts must nonetheless exercise Rule 33 authority 'sparingly' and in 'the most extraordinary of circumstances.'"  *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992); *see also United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).

The defendant bears the heavy burden of demonstrating that a new trial is warranted.  *See United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).  A motion for a new trial under Rule 33 "'should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'"  *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (quoting *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998)).  Unlike the standard under Rule 29, the court is entitled under Rule 33 to "weigh the evidence and in so doing evaluate for itself the credibility of the witnesses."  *Sanchez*, 969 F.2d at 1413 (internal quotation marks and citation omitted).  However, because "courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment."  *Ferguson*, 246 F.3d at 133 ("An example of exceptional circumstances is where testimony is 'patently incredible or defies physical realities,' although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief."  (quoting *Sanchez*, 969 F.2d at 1414)).  Accordingly, the court "must strike a

balance between weighing the evidence and credibility of witnesses and not 'wholly usurping' the role of the jury." *Ferguson*, 246 F.3d at 133 (internal citation omitted).

The crucial question on a Rule 33 motion is whether it would be a "manifest injustice" to let the guilty verdict stand. *Id.* at 134. A "manifest injustice" occurs where a trial court cannot be satisfied that "competent, satisfactory, and sufficient evidence" supports the jury's finding of guilt beyond a reasonable doubt. *Id.* (citing *Sanchez*, 969 F.2d at 1414). For a trial court to grant a Rule 33 motion, the court "must harbor a real concern that an innocent person may have been convicted." *United States v. Guang*, 511 F.3d 110, 119 (2d Cir. 2007).

## DISCUSSION

### I.  Rule 29: Sufficiency of the Evidence at Trial Supporting Conviction

As set forth in detail above, and discussed briefly below, the record at trial contains more than ample evidence for a rational trier of fact to find O'Brien guilty beyond a reasonable doubt on each count. At trial, the government presented physical evidence, O'Brien's own admissions, and circumstantial evidence to demonstrate beyond a reasonable doubt that O'Brien ran a profitable drug importation and distribution conspiracy. The Court has considered each of O'Brien's arguments and finds them to be without merit.

First, there is no question that the substances in question – anabolic steroids and methylone – are illegal controlled substances under the charged convictions. The DEA chemist testified that the substances seized at the airport, at the mailbox stores, from Kimberly Ruud and Ruud's car, and from the stash house were all methylone or anabolic steroids. (*See* Tr. at 436, 451–58; GX 39.)

Second, there was ample evidence that the drugs seized in this case were imported into the United States. *See* 21 U.S.C. §§ 952, 960. At trial, the government presented (1) witness testimony that the packages seized at JFK Airport were shipped from China and contained

methylone, (Tr. at 33–49, GX 39); (2) physical evidence of international shipping mail receipts showing similar shipments from China, (Tr. at 220–25; GX 209A); and (3) O'Brien's own admissions that he used a black Acer computer to order methylone from China and had packages of methylone shipped to various mailboxes and UPS stores in the United States. (Tr. at 117.)

Third, there was ample evidence for a rational juror to conclude beyond a reasonable doubt that the importation and distribution of these drugs involved a conspiracy and that O'Brien was in charge of the conspiracies. *See United States v. Praddy*, 725 F.3d 147, 153 (2d Cir. 2013) (holding that conspiracy constitutes an agreement to commit an unlawful act). The government presented evidence of several participants in O'Brien's illegal importation and distribution business, including Kimberly Ruud, Mike Wagner, and Anthony Deservio. Specifically, the government presented: (1) witness testimony of Kimberly Ruud's arrest after picking up packages of methylone and anabolic steroids shipped from China, (Tr. at 46–58); (2) O'Brien's own admissions that he had an individual by the name of "Mike Wagner" pick up packages of methylone shipped from China to various mailboxes in the United States, (Tr. at 117); (3) twenty-seven airway bills found in the College Point apartment for packages mailed from China, addressed to "Mike Wagner" and other individuals with the last name "Wagner," (Tr. at 220–25; GX 209A); (4) text conversations between O'Brien and Ruud, on the date of Ruud's arrest, directing her to pick up packages from specific mailboxes and avoid other mailboxes, (Tr. at 208–11; GX 401C); (5) copies of mailbox agreements found in the College Point apartment, which were signed by Ruud and which correspond to the same mailboxes from which Ruud picked up packages on the date of her arrest, (Tr. at 212–19; GX 202A–E); and (6) a black Acer computer in the College Point apartment, matching O'Brien's earlier description, containing discussions of drug orders, tracking instructions, lists of O'Brien's arrested workers, and web

browser searches for the USPS tracking information corresponding to the packages seized from Ruud, (Tr. at 282–97, 322–25; GX 407–09, 411–414, 416–21, 434–35.)

Fourth, there was ample evidence that O'Brien possessed methylone and anabolic steroids with the intent to distribute. The government provided evidence of drug paraphernalia, equipment to package and make drugs, and large quantities of drugs, all of which are hallmarks of possession with intent to distribute. *See United States v. Martinez*, 54 F.3d at 1040, 1043–44 (2d Cir. 1995) (finding that defendant's possession of drug paraphernalia and equipment to weigh, cut, and package drugs demonstrated his intent to distribute); *United States v. Hernandez*, 980 F.2d 868, 871–72 (2d Cir. 1991) (finding that an intent to distribute may be inferred from the large quantity of drugs involved, such as 100 grams or more of heroin). Methylone expert Special Agent Michael Fernandez of HSI and anabolic steroid expert Dr. Harrison Pope testified that a total of approximately seventeen kilograms of methylone (approximately 170,000 doses) and twenty-one kilograms of anabolic steroids (approximately 21,000 doses) were found in the apartments and on Kimberly Ruud at her arrest, valued at $1.7 million and $2.1 million dollars, respectively. (Tr. at 472–73, 579–82.) Moreover, the government presented witness testimony and substantial physical evidence of drug paraphernalia and drug manufacturing and packaging equipment found at the College Point and 41st Road apartments, including currency counting machines, vials of liquid steroids labeled "Genzyme," 250 sheets of "Genzyme" labels, drug packaging materials, a pill press machine, scales, beakers of yellow liquid, and a heater that could be used for processing drugs. (*See* Tr. at 164–66, 282–97, 339–42, 377–79; GX 301B–H, 304A–C, 306A–B, 407–09, 411–14, 416–21.)

O'Brien's principal challenge under Rule 29 is that the government did not present sufficient evidence to connect O'Brien to the evidence recovered at the 41st Road apartment. Specifically, O'Brien argues that the government did not present sufficient evidence to

corroborate the claim that O'Brien was "George Manolas," the lessee of the 41st Road and College Point apartments, and as such, the government failed to link O'Brien to the operation of the stash house and the conspiracy to import and distribute the seized drugs. (Post-Trial Mot. at 6.)

O'Brien is correct that agents did not find any identification materials in the name of George Manolas on O'Brien and that Jones, his real estate broker, failed to identify him as George Manolas, the lessee of the 41st Road apartment.[7] However, the government provided ample circumstantial evidence linking O'Brien to the stash house. First, the government offered the testimony of Agent Alahverdian. Agent Alahverdian testified that O'Brien admitted that the 41st Road apartment was his stash house before consenting to a search of the apartment. (Tr. at 119–25.) This was later confirmed by Agent Marino, who testified that O'Brien supplied the agents with the correct apartment number after the agents identified the apartment building's address. (Tr. at 683.) Agent Alahverdian further testified that O'Brien described, with sufficient accuracy, what the agents would find inside the apartment. (Tr. at 120–21.) According to Agent Alahverdian, O'Brien informed the agents they would find approximately ten kilograms of methylone, (Tr. at 120–21), and this drug type and quantity were later confirmed by government expert Benintendo, who testified that approximately twelve kilograms of methylone were found in the 41st Road apartment. (Tr. at 451–58.)

Second, the government offered the lease agreement to the 41st Road apartment into evidence, accompanied by the testimony of Chao Jones. (GX 300.) The address of the College

---

[7] The government was under no obligation to prove that O'Brien leased the College Point or 41st Road apartments. At issue is O'Brien's conviction for using, maintaining, *or* leasing a drug-involved premises (or "stash house"), which in this case was the 41st Road apartment. *See United States v. Facen*, 812 F.3d 280, 290 (2d Cir. 2016) (noting that the government's evidence of the defendant using the stash house was sufficient to support a conviction under § 856(a)(1), even though the government did not prove the defendant maintained or leased the stash house). Therefore, evidence that O'Brien used the stash house to distribute, manufacture, or package controlled substances is sufficient to support a conviction under § 856(a)(1).

Point apartment, where O'Brien was first arrested, appears on the first page of the lease as the address of George Manolas. (GX 300.) Government witness Jones testified that she leased both apartments to "George." (Tr. at 634–37.) Though she could not identify the man she knew as George, the circumstantial evidence surrounding her testimony supported a finding that George Manolas was a false identity of O'Brien. (Tr. at 640.) Jones testified that she was a signatory on the lease agreement for the 41st Road apartment. (Tr. at 633; GX 300.) Jones's signature appears on the agreement ("J.J. Jones") along with the signature of the apartment owners, one of whom is named "Lina." (GX 300.) These names matched those previously read by Agent Schottenfeld from the contact list on one of O'Brien's cell phones recovered from the College Point apartment. (Tr. at 173–75; GX 404D.) Specifically, the contact list included "Chao, J.J.," "JJ Realtor," and "Landlady Lina." (Tr. at 173–75; GX 404D.) Jones also testified that in 2012, she showed the College Point apartment to "George" and his girlfriend Danielle, who worked in a beauty business purchased with the help of George. (Tr. at 635–36.) Recovered from inside the College Point apartment was a picture of O'Brien with his former girlfriend Danielle Girace. (Tr. at 401–02; GX 313 A–B.) According to jail calls between O'Brien and his then-current girlfriend Thairi Cabrera, O'Brien had given Danielle $300,000 to purchase the beauty salon where she worked. (Tr. at 250; GX 608.)

Third, the government offered evidence found inside the College Point and 41st Road apartments that further connects O'Brien to the two locations. Recovered from inside the College Point apartment was a birth certificate in the name of George Manolas. (GX 205C.) Recovered from inside the 41st Road apartment were the following: (1) two personal photos of O'Brien, one of which depicted O'Brien with his former girlfriend Danielle Girace (Tr. at 401–02; GX 313 A–B); (2) shipping labels, invoices, and Ritz Carlton cards in the names of O'Brien's other aliases, (Tr. at 380, 399–405; GX 301KK, 311G, 313C–D, 313G, 314B); and (3)

vials labeled "Genzyme" identical to those found in the College Point apartment and in O'Brien's car at his October 29, 2013 arrest, (Tr. at 165–68, 342–44, 621–29; GX 41, 241, 301G–H).

Finally, the government played two recordings of jail calls made by O'Brien to his then-current girlfriend, Thairi Cabrera, directing her to open up letters and envelopes located in O'Brien's home that were addressed to "George Manolas." (Tr. at 250, 253; GX 608, 616.)

Thus, the government produced multiple testifying witnesses and an abundance of physical evidence to link O'Brien both to the name George Manolas and to the 41st Road apartment. The weight of that evidence, the credibility of the witnesses, and the ultimate conclusion of fact were questions for the jury to decide, and the Court will uphold the jury's verdict even when it is based entirely on circumstantial evidence. *See Jackson*, 335 F.3d at 180. Taken together and viewed in the light most favorable to the government, with all permissible inferences drawn in the government's favor, the evidence at trial demonstrates that O'Brien used, maintained, or leased a stash house and was involved in a conspiracy to import and distribute methylone and anabolic steroids. In other words, the evidence put forward by the government, when viewed as a whole, was sufficient for a reasonable trier of fact to find beyond a reasonable doubt that O'Brien was guilty of each and every count of conviction. Accordingly, O'Brien fails to satisfy his "heavy burden" of demonstrating that "no rational reasonable jury could find guilt beyond a reasonable doubt." *See Guadagna*, 183 F.3d at 130. Thus, O'Brien's Rule 29 motion is denied.

## II.     Rule 33: Claims of Error in Support of New Trial

In support of his Rule 33 claims, O'Brien specifically argues that he must be acquitted based on the following: (1) new evidence revealed at trial relating to how the agents gained entry to the 41st Road apartment; and (2) alleged errors in the trial transcript that affected jury

deliberations.  (Post-Trial Mot. at 4.)  Applying the Rule 33 standard, the Court finds O'Brien's arguments unavailing.

### A.  Agents' Means of Entry

O'Brien argues that a new trial is warranted because Agent Moloney's testimony of how the agents obtained entry into the 41st Road apartment constitutes "newly discovered" evidence that previously had not been disclosed.  Specifically, O'Brien argues that (1) he was not previously made aware that the agents used his signed consent-to-search form to gain entry to the apartment; (2) the consent form was signed "Michael O'Brien" rather than "George Manolas"; and (3) the government did not offer evidence as to who let the agents into the apartment.  (Post-Trial Mot. at 5–6.)

In order to warrant a new trial based on newly discovered evidence, the Second Circuit requires that

> (1) the evidence be newly discovered *after* trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in acquittal.

*United States v. Persico*, 645 F.3d 85, 109 (2d Cir. 2011) (quoting *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007)) (emphasis added).  As an initial matter, the evidence about which O'Brien complains is not newly discovered.  Evidence is newly discovered if it "could not with due diligence have been discovered before or during trial . . . ."  *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980).  Here, the evidence was elicited at trial, and, as such, it does not call into concern the fairness issues associated with evidence discovered after trial.  O'Brien had the opportunity to cross examine the witness and did, in fact, cross examine the witness regarding the evidence at issue.

In any case, O'Brien's arguments as to these purported deficiencies in the record of evidence offer no relief. The government was not required to prove the means by which its agents conducted each search. In fact, the jury was specifically instructed not to consider the legality of how the evidence was obtained:

> Evidence has been admitted in this trial that was obtained from searches conducted of apartments, automobiles, mail parcels, computers, and mobile telephones. All of this evidence was obtained lawfully. The use of such searches to gather evidence is perfectly lawful and the Government has the right to use such evidence in this case. You may give this evidence such weight as you believe it deserves.

(Tr. at 783.)

Moreover, to the extent O'Brien attempts to relitigate issues decided at the suppression hearing, he may not do so through a Rule 33 motion. *United States v. Delva*, No. 12-CR-802 (KBF), 2015 WL 629375, at *4 (S.D.N.Y. Feb. 13, 2015) (denying defendant's Rule 33 motion because it was merely an attempt to relitigate the arguments he raised before the court in his suppression motions); *see also United States v. Christian*, No. 11-CR-425 (ENV), 2015 WL 3941458, at *15 (E.D.N.Y. June 24, 2015) (denying defendant's Rule 33 motion because it was merely an attempt to relitigate evidentiary motions that were briefed and decided before trial); *United States v. Soto*, No. 12-CR-566 (RPP), 2014 WL 1694880, at *7 (S.D.N.Y. Apr. 28, 2014) ("[A] Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions."). O'Brien argued in his suppression motion that the apartments were searched illegally, as his name was not on the lease for the 41st Road apartment, and he was not there to let the agents into the apartment. (Mot. Suppress at ¶7; Mem. Supp. Mot. Suppress at 3.) Just like the defendants' arguments in *Delva* and *Christian*, these issues were briefed and decided during pre-trial evidentiary proceedings, and thus offer no basis to warrant a new trial. *See Christian*, 2015 WL 3941458, at *15; *Delva*, 2015 WL 629375, at *4.

### B. Claimed Error in the Trial Transcript

O'Brien also claims that he is entitled to a new trial because an error in the trial transcript of Chao Jones's testimony, sent back to the jury during deliberations, unfairly prejudiced him and misled the jury as to the "critical non-identification of O'Brien as the lessee of the 'stash house.'" (Post-Trial Mot. at 7.) O'Brien's claim is without merit.

The portion of the transcript at issue relates to O'Brien's cross-examination of Jones, the real estate broker who leased the 41st Road apartment to man she knew as "George." The relevant portion that was sent back to the jury reads:

> Q: Do you see – can you identify in the courtroom today the person who leased the apartment or either property from you?
> A: George?
> Q: Yes. Can you identify George in the courtroom today?
> A: Can't remember now.

(Tr. at 640.)

O'Brien claims that the transcript should read:

> Q: Do you see – can you identify in the courtroom today the person who leased the apartment or either property from you?
> A: I no see. Do you mean George?
> Q: Yes. Can you identify George in the courtroom today?
> A: No [long pause], Can't remember now. It's been a long time.

(Post-Trial Mot. at 7.)

As an initial matter, a certified transcript of evidence is entitled to a statutory presumption of accuracy. 28 U.S.C. § 753(b) ("The transcript . . . shall be deemed prima facie a correct statement of the testimony taken and proceedings had."). O'Brien provides nothing other than his own proposed version of the transcript to overcome this presumption.

Moreover, upon receipt of the jury's request for Jones' testimony, O'Brien reviewed the court reporter's transcript and agreed – without any objection – that it should be sent back to the jury as transcribed. (Tr. at 894–95.) "As a general proposition defense counsel is as responsible

as the prosecutor for seeing to it that only proper exhibits are sent to the jury room, and normally the failure of counsel to register a timely objection to the submission of improper evidence to the jury will be deemed a waiver, unless it is shown that the evidence was so prejudicial that the defendant was denied a fair trial." *United States v. Camporeale*, 515 F.2d 184, 188 (2d Cir. 1975) (internal citations and alterations omitted); *see also Barnett v. United States*, 870 F. Supp. 1197, 1205 (S.D.N.Y. 1994) (finding that the defendant's failure to timely object to the submission of improper evidence to the jury constituted a waiver). Here, O'Brien failed to register a timely objection and accordingly, O'Brien waived any objection to the submission of the Jones testimony transcript.

Equally important, O'Brien suffered no prejudice. It is clear from the transcript provided to the jury during deliberations that Jones did not identify O'Brien as "George," the lessee of the 41st Road apartment. And in fact, O'Brien himself made this fact a centerpiece of his argument on summation:

> The defendant has been accused of being the lessee of a stash house . . . . Yet the only witness who could have ever placed the defendant inside that location could not identify the defendant as being the lessee. The witness was the real estate agent responsible for leasing both locations and who, by her own admission, made enough cash commission which should have left the identity of the lessee resonating in her memory.
>
> . . . . 100 percent of the civilians who came before this court to testify failed to identify the defendant.

(Tr. at 854–55, 863–64.) This is not a circumstance where "legitimate reliance on the mistaken version would have created a situation demanding declaration of a mistrial." *United States v. Carter*, 347 F.2d 220, 221 (2d Cir. 1965). Nor does this case give rise to a concern that an "innocent person may have been convicted," *see Guang*, 511 F.3d at 119, particularly given the

other evidence connecting O'Brien to the 41st Road Apartment.  Accordingly, O'Brien's claim fails.

## CONCLUSION

For the foregoing reasons, the Court denies O'Brien's Rule 29 and Rule 33 motions in their entirety.

SO ORDERED.

Dated: Brooklyn, New York
      May 1, 2017

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge